J-S65014-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: Z.P., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.P. AND J.P., NATURAL PARENTS | No. 494 WDA 2016 |

Appeal from the Order March 8, 2016
In the Court of Common Pleas of Cambria County
Domestic Relations at No(s): CP-11-DP-004-2016,
FID 11-FN-008-2016

BEFORE: LAZARUS, J., OLSON, J., and PLATT, J.[*]

MEMORANDUM BY LAZARUS, J.:           **FILED SEPTEMBER 22, 2016**

L.P., Mother, and J.P., Father, (collectively "Parents"), are the natural parents of Z.P., a minor. Parents appeal from the order entered in the Court of Common Pleas of Cambria County adjudicating Z.P. dependent as defined in section 6302 of the Juvenile Act.[1] After our review, we affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Section 6302, "Dependent child," provides, in relevant part:

A child who:

(1)  is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that

*(Footnote Continued Next Page)*

On December 18, 2015, Cambria County Children and Youth Services (CYS) received a report of physical abuse of Z.P., who was three months old, by Father. On that date, Mother was at work. Father had placed Z.P. in a rocking bassinet and left the room to do laundry. Father reported that when he returned, he found the bassinet had been tipped over, and Z.P. was wedged between the bassinet and the couch. Father picked Z.P. up and comforted him, at which time Z.P. stiffened, arched his back, looked dazed and became unresponsive. Father called 911 and emergency medical services transported Z.P. to the emergency room at Conemaugh Valley Memorial Hospital (CVMH).

Father reported to CVMH staff that the family cat may have knocked over the bassinet (the family has a cat and two large dogs). A CT scan indicated a subdural hematoma. Thereafter, Z.P. was transferred to the ICU at Children's Hospital ("Children's") in Pittsburgh. At Children's, Father reported that he believed one of the family's dogs, an 80-pound Boxer may have knocked over the bassinet.

*(Footnote Continued)* ────────────────

> places the health, safety or welfare of the child at risk,
> including evidence of the parent's, guardian's or other
> custodian's use of alcohol or a controlled substance that
> places the health, safety or welfare of the child at risk[.]

42 Pa.C.S. § 6302.

At the dependency hearing, both Mother and Father testified. Father testified that he did not tell CVMH staff that the cat might have caused the accident; he stated that he remembered reporting that maybe one of the dogs, the Boxer, had caused the accident. N.T. Dependency Hearing, 3/7/16, at 94. He denied ever shaking Z.P. *Id.* at 101. Father testified that he was honorably discharged from the Air Force following a bus accident in Kuwait, where he was stationed as a military police officer. As a result of the accident, Father suffered a hip injury. He also suffered emotional trauma due to the fact he was unable to assist injured civilians because the accident occurred during Ramadan, and religious and legal prohibitions prevented civilian aid during this time. Several civilians died. *Id.* at 96-100. Father was diagnosed with mild Post Traumatic Stress Disorder (PTSD), but stated that he did not get counseling for it, and that it "was maintained and under control." *Id.* at 98. Father indicated his willingness to cooperate with CYS.

Mother testified that when she received the message that Z.P. was injured, she went home to get a car seat, believing Z.P. would be released that day. At home, she saw the bassinet on its side near the couch. *Id.* at 86. She also testified that they have two large dogs, an English Mastiff and a Boxer, and a cat. *Id.* Mother testified that she remembered reporting to CVMH staff that the dog may have knocked over the bassinet; she denied ever reporting that it may have been the cat. *Id.* at 86-87.

Doctor Jennifer Wolford, a board certified pediatrician, testified that in addition to reviewing the records from CVMH, she performed various diagnostic tests on Z.P. during his three-day stay in the Children's ICU. She also obtained a medical history from Parents. An MRI confirmed Z.P.'s subdural hematoma; eye examinations revealed retinal bleeding in both eyes. *Id.* at 6-8. Dr. Wolford testified that both the subdural hematoma and the retinal bleedings were recent, and that based on her experience and training, Z.P.'s injuries were caused by abusive trauma resulting from severe shaking, known as "shaken-baby syndrome." *Id.* at 10-11. She further opined that the injuries were not consistent with a fall:

> A: [I]t's my medical assessment that [Z.P.] showed symptoms: unresponsiveness, not waking up, arching his back, stiffening, the subdural hematomas and the bilateral retinal hemorrhages that this is the result of violent shaking back and forth and that this is the result of abusive trauma to this child, so this is abusive head trauma and that it is the shaking and the shearing force back and forth that caused this brain injury and these retinal hemorrhage in all four quadrants, both eyes, out to the periphery.
>
> Q: If a child fell, and I'm just talking about these bilateral retinal hemorrhaging at this time, not about the subdural hematoma. But if a child fell and he developed, he got bilateral retinal hemorrhaging, how far in a distance . . . based upon your education and experience, how far would a child have to fall to cause him to get bilateral retinal hemorrhaging? A distance; two feet, one foot, four feet, ten?
>
> A: Right. So again, I use the example of the accidental roll off the bed or off the changing table, and in those falls we do not see retinal hemorrhages. So that's three to four feet off a changing table. Off a bed obviously it's about 30 inches and we do not see retinal hemorrhages. We certainly can't drop children to see what causes retinal hemorrhages, but from computer

- 4 -

> modeling we know that it's estimated that a fall of a height about three stories would cause these types of injuries.

*Id.* at 14-15. Dr. Wolford opined within a reasonable degree of medical certainty, that Z.P. had been the victim of shaken-baby syndrome, or abusive head trauma. *Id.* at 16.

Doctor Jonathan Arden, board certified in anatomic and forensic pathology, testified as rebuttal expert. He did not examine Z.P.; however, he reviewed Z.P.'s medical records, including the MRI and CT scans, the same medical records and diagnostic test results that Dr. Wolford had examined. Doctor Arden agreed with Dr. Wolford's conclusion that there was no biological cause for the injuries, but he disagreed the cause was shaken-baby syndrome. *Id.* at 38-39. He stated that trauma Z.P. suffered at birth (c-section with use of forceps) could have caused a subdural hematoma and that Z.P.'s fall caused a "re-bleed" of the birth injury; in other words, that such injuries can also be related to impact. *Id.* at 40, 47-48. Doctor Arden acknowledged, however, that these injuries were rare. *Id.* at 47. Doctor Arden also acknowledged, on cross-examination, that the medical and investigative reports indicated that Z.P. did not hit the floor, but was wedged between the rocker and the couch. *Id.* at 59. He also acknowledged that the bilateral retinal hemorrhage and the acute subdural hematoma that Z.P. suffered were consistent with shaken-baby syndrome. *Id.* at 58.

Detective George Musulin of the West Hills Regional Police Department testified that he went to Parents' home and observed the scene of the accident as well as the family cat and two large dogs. He stated that Father's written and verbal statements were consistent with the history in the medical records. Detective Musulin testified that Father reported that he believed the dog had caused the accident. *Id.* at 77.

Following the hearing, the court found that CYS had established, by clear and convincing evidence, that: Z.P. was a victim of physical abuse pursuant to the Child Protective Services Law, 23 Pa.C.S. § 6303(b.1)(8)(iii);[2] Father is the perpetrator pursuant to 23 Pa.C.S. § 6303;[3]

_____

[2] Child abuse.-- The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:

* * *

(8) Engaging in any of the following recent acts:

* * *

(iii) Forcefully shaking a child under one year of age.

23 Pa.C.S. § 6301(b.1)(8)(iii).

[3] "Perpetrator." A person who has committed child abuse as defined in this section. The following shall apply:

(1) The term includes only the following:

(i)      A parent of the child.

* * *

23 Pa.C.S. § 6303(1)(i).

- 6 -

and Z.P. is a dependent child pursuant to section 6302 of the Juvenile Act.

*See* 42 Pa.C.S. § 6302, *supra* at note 1.  *See also* N.T. Dependency

Hearing, 3/7/16, at 104-08.  The court ordered Z.P. remain in the legal and

physical custody of Mother, and further ordered that

> [Father] can remain in the home under the condition that he
> have no unsupervised contact with [Z.P.]   Any unsupervised
> contact will result in immediate removal of [Z.P.] from the
> residence and the child shall be taken into the care and custody
> of Cambria County Children and Youth Services.  [Father] is to
> have no unsupervised contact with [Z.P.] until further order of
> the court.  [Father] is to immediately begin PTSD counseling and
> anger management classes.

Order, 3/8/16.

Parents filed this appeal.  The trial court ordered Parents to file a

Statement of Errors Complained of on Appeal pursuant to Pa.R.A.P. 1925(b).

Parents raise the following claims:

1. Whether Cambria County Children and Youth Services met
   its burden of proof in establishing by clear and convincing
   evidence that Z.P. was a dependent child pursuant to 42
   Pa.C.S. § 6301 *et seq*. where there was insufficient
   evidence upon which the court could find Mother was unfit.

2. Whether the court's finding that Z.P. was an abused child
   is against the weight of the evidence.

3. Whether trial counsel was ineffective for failing to object to
   the expert medical testimony that "subdural hemorrhage
   and bi-lateral retinal hemorrhaging were a result of

shaking," which fails to meet the **Frye**[4] admissibility standard.

4. Whether the trial judge, Judge Tamara R. Bernstein, should have recused, and whether counsel was ineffective for failing to file a motion for recusal.

"[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." **In re R.J.T.**, 9 A.3d 1179, 1190 (Pa. 2010). Nevertheless, we accord great weight to the trial court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and witnesses. **In re M.K.**, 636 A.2d 198, 201 (Pa. Super. 1994). "[E]ven where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment[.]" **In re Adoption of S.P.**, 47 A.3d 817, 827 (Pa. 2012),

_____

[4] **Frye v. United States**, 293 F. 1013 (D.C.Cir.1923) ("Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."). **See Commonwealth v. Topa**, 369 A.2d 1277 (Pa. 1977) (adopting **Frye** test). **See also Blum v. Merrell Dow Pharmaceuticals, Inc.**, 705 A.2d 1314 (Pa. Super. 1997).

*citing* **In re Adoption of Atencio**, 650 A.2d 1064, 1066 (Pa. 1994).

Instead, we defer to the trial judge, so long as the factual findings are

supported by the record and the court's legal conclusions are not the result

of an error or abuse of discretion. **S.P.**, 47 A.3d at 817. We note also that

the Juvenile Act grants juvenile courts broad discretion when determining an

appropriate disposition, and that disposition will be overturned only upon a

showing of a manifest abuse of discretion. **Interest of C.A.G.**, 89 A.3d

704, 709 (Pa. Super. 2014)

After our review, we are satisfied that the record reflects a

comprehensive inquiry and that the court applied the appropriate legal

principles and standards. **See Matter of George**, 414 A.2d 1063 (Pa.

Super. 1979). The court's findings are supported by the record, and we

discern no error or abuse of discretion. **S.P.**, **supra**. We are also satisfied

that the trial court's May 6, 2016 opinion properly disposes of Parents'

claims on appeal and therefore we rely on that opinion to affirm the March 8,

2016 order adjudicating Z.P. dependent.[5]

Additionally, because we find Parents' claims to be meritless, we find

their ineffectiveness challenges with respect to the **Frye** issue and the

recusal issue meritless as well. **See In re S.M.**, 614 A.2d 312, 316 (Pa.

_____

[5] We note that the brief filed on behalf of the guardian *ad litem* adopts the argument and position of CYS. **See** Brief for Appellee, Guardian *Ad Litem*, at 3-5.

Super. 1992) (to succeed on ineffectiveness claim in dependency proceeding, "appellant must make a strong showing of ineffectiveness of counsel. [T]he parent must come forward with evidence that indicates to a high degree of likelihood that but for an unprofessional error on the part of counsel, the child would not have been found to be dependent."). We agree with the court's analysis in its opinion that Parents' contention that Judge Bernstein was impartial because she had, in her former position as a prosecutor, prosecuted a shaken-baby case is indeed the "start of a quick slide down a very slippery slope[.]" Trial Court Opinion, 5/6/16, at 15.

We affirm the March 8, 2016 dependency order based on the juvenile court's opinion, and we direct the parties to attach a copy of that opinion in the event of further proceedings.

Order affirmed.


PLATT, J., Joins the memorandum.

OLSON, J., Concurs in the result.


Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/22/2016

IN THE COURT OF COMMON PLEAS OF CAMBRIA COUNTY, PENNSYLVANIA
JUVENILE DIVISION

|                                         |     |                      |
|-----------------------------------------|-----|----------------------|
| IN THE MATTER OF:                       | *   |                      |
|                                         | *   |                      |
| Z.P., DOB 9/17/2015,                    | *   | CP-11-DP-0000004-2016 |
|                                         | *   |                      |
|                                         | *   |                      |
| Appeal of L.P. and J.P., Natural Parents | *   |                      |

# RULE OF APPELLATE PROCEDURE 1925 (a)(2)

# OPINION

**Bernstein, J.:** L.P. and J.P. the appellants herein, are the natural parents of Z.P.[1] who was

determined to be a dependent child on March 8, 2016, at which time he remained in the care

of his mother L.P. (Mother). In addition to finding Z.P. to be a dependent child the court

found that Z.P. was a victim of child abuse and that his father, J.P. (Father) was the

perpetrator of the abuse.

On April 6, 2016, Appellants filed a timely Notice of Appeal and Concise Statement

of Errors Complained of on Appeal (Concise Statement) pursuant to Pennsylvania Rules of

Appellate Procedure 905(a)(2) and 1925(a)(1). Pa.Rs.A.P. 905, 1925 (West 2016).

Appellants' Concise Statement lists four matters complained of on appeal that raise these five

allegations of error:

1. Did the Court err in determining that Z.P. was a dependent child when Mother was

   able to provide care for him?

2. Did the Court err in determining that Z.P. was the victim of child abuse?

---

[1] Since the subject of this appeal is a juvenile the primary parties will be referred to by their initials to provide
confidentiality.

EXHIBIT 1

3. Did the Court err in basing its finding of abuse on novel scientific evidence?

4. Did the Court err in failing to recuse itself for bias?

5. Was trial counsel ineffective?

Appellants do not challenge the Court's determinations that Z.P. is a dependent child as to Father. For the reasons discussed below the appeal should be dismissed and the Court's Order affirmed.

## FACTUAL BACKGROUND[2]

Cambria County Children and Youth Service (CYS) initiated services to this family on December 18, 2015, following receipt of a report of physical abuse of Z.P. by his Father. On December 18, 2015, Father placed Z.P. in a rocker bassinet in the living room of the family's residence and then went into the basement to change a load of laundry. When he returned to the living room he found the rocker had been knocked over and that Z.P. was wedged between the rocker and the couch and was crying. Father picked Z.P., comforted him, and went to change his diaper. At that time Z.P. became stiff, arched his back, looked dazed, was sweaty, and became unresponsive.

Father called 911, EMS arrived, and Z.P. was transported to the emergency room at Conemaugh Valley Memorial Hospital (CVMH). Records from CVMH show that Father provided the above description of events to medical staff and indicated a belief that the family cat may have knocked over the rocker bassinet. Later at Children's Hospital (Children's) in Pittsburgh Father would inform staff that he believed the family's approximately 80-pound Boxer knocked over the rocker bassinet. In their testimony both parents deny having informed

---

[2] This summary is distilled from the transcripts without citation to specific portions of the record.

EXHIBIT 1

CVMH staff that it was the cat and insisted they told them they thought the dog may have caused the accident.

At CVMH Z.P. was examined and had various diagnostic procedures performed including a head CT scan that revealed a subdural hematoma. Z.P. was stabilized and transferred to the pediatric ICU at Children's. At Children's Z.P. came under the care of doctor Jennifer Wolford (Wolford) who has been board certified in pediatrics since 2010 and has been the medical director of the children's advocacy division at the hospital for two and a half years. Wolford testified that in addition to reviewing the records from CVMH, she obtained a medical history from the parents as outlined above, and conducted various diagnostic tests on Z.P. during his three-day stay in the ICU. Wolford testified that Z.P. showed no bruising, abrasions, lacerations, soft tissue swelling, or broken bones, that an MRI confirmed the subdural hematoma, that eye examinations revealed retinal bleeding in both eyes in all four quadrants out to the periphery, and that both the subdural hematoma and retinal bleeding was recent.

Wolford testified that based on the results of the tests she ruled out various biological, genetic, or pathogenic causes for Z.P.'s injuries. In addition Wolford ruled out the possibility that the injuries were caused at the time of birth since Z.P. was three-months old at the time and any retinal bleeding that occurred at birth would have healed or been reduced by December 18th and that symptoms of a subdural hematoma would have presented almost immediately after occurring. She opined that based on her experience and training the injuries were caused by abusive trauma resulting from a severe shaking incident that would have occurred shortly before symptoms presented. Wolford explained that all of Z.P.'s physical symptoms of being unresponsive, arching his back, and stiffening in conjunction with his

EXHIBIT 1

subdural hematoma and retinal bleeding were consistent with violent shaking rather than an accidental fall. Wolford explained that in her experience of seeing child fall victims on a regular basis a short distance fall onto a soft surface would not result in the injuries present. Further she explained that while it was possible for such injuries to occur as a result of a fall the studies show that such falls were from a greater height and involved contact with either a single or multiple hard surfaces. Wolford further testified that these injuries were not consistent with a collision with or impact caused by an 80-pound dog. Wolford concluded that to a reasonable degree of medical certainty Z.P.'s injuries were the result of shaken baby syndrome or what is called abusive head trauma.

Doctor Jonathan Arden (Arden) testified that he has been certified in anatomic and forensic pathology since 1985, he was a full-time medical examiner for twenty years, has been a private consulting pathologist for the last twelve years, and also works as a part-time medical examiner in West Virginia for the last eight and a half years. Arden testified that he had not examined Z.P. but had reviewed all his medical records and diagnostic test and studies including his MRI and CT scans. Arden testified that he was provided the same medical history as Wolford had been relative to the cause of the accident being the family dog knocking over the rocking bassinet.

Arden testified that he agreed that there was no biological cause for Z.P.'s injuries but disagreed that the cause of the injuries was shaken baby syndrome or what he preferred to call abusive head trauma. Arden explained that Z.P.'s injuries were consistent with abusive head trauma but could also have been caused at birth or by accidental means. Arden testified that Z.P. was born premature by way of C-section with the use of forceps and that this method of delivery reduced but did not eliminate the possibility that he suffered subdural hematoma and

EXHIBIT 1

retinal bleeding at that time and that the bleeding seen on December 18th was a re-bleed of the original injury. In addition to the possibility the recent injury was a re-bleed of a birth injury Arden explained that injuries consistent with those suffered by Z.P. had been documented to occur as a result of falls. He explained that it was possible the injuries were caused by a collision of the 80-pound dog with the rocker bassinet resulting in Z.P. falling and striking the floor. Arden acknowledged that the documented cases of such injuries occurring as the result of a fall were rare but that they did occur. Specifically, Arden pointed to an article in the Journal of Forensic Sciences authored by doctor Patrick Lantz that detailed a case involving a fall down a flight of stairs that resulted in injuries including a subdural hematoma and retinal bleeding.

Ashley Cerwensky (Cerwensky) testified: that she is the CYS caseworker assigned to Z.P.; that she was informed by CVMH personnel that Father informed them the accident was caused by the family cat; that Z.P.'s safety with his parents was being assured through a safety plan that had grandmother living in the residence to supervise Father's interactions with Z.P.; that both parents had submitted to psychological evaluations; that the psychologist had concerns that the parents were being evasive in response to some questions in order to conceal issues; and that the parents had been cooperative with the Agency.

Detective George Musulin (Musulin) testified: that he is employed by the West Hills Regional Police Department; that he conducted an investigation into the allegations; that he spoke with Father; that he went to residence and observed the scene of the accident as well both the family cat and two large dogs; that Father gave him both a written and verbal statement of events; that Father's statements were consistent with the history in the medical

EXHIBIT 1

records; that Father denied injuring Z.P.; and that Father believed the accident to have been caused by the dog.

Mother testified: that she had gone to work in the morning of December 18th; that at approximately 2:15 p.m. she received a message that Z.P. was injured; she went home to obtain a car seat and other items believing he would be released that day; that when she was home she saw the rocker bassinet lying on its side near the couch; and that she went to CVMH and eventually to Children's. Mother denied ever telling CVMH staff that the cat caused the accident but remembered saying it may have been the dog.

Father testified that he placed Z.P. in a rocker bassinet in the living room of the family's residence and then went into the basement to change a load of laundry. When he returned to the living room he found the rocker had been knocked over and that Z.P. was wedged between the rocker and the couch and was crying. Father picked Z.P., comforted him, and went to change his diaper. At that time Z.P. became stiff, arched his back, looked dazed, was sweaty, and became unresponsive at which time he called 911. Father denied ever telling CVMH staff the cat caused the accident but instead recalls telling them that maybe the dog had done so. Father denied ever shaking Z.P. and indicated a willingness to cooperate with CYS. Father acknowledged that he gave a statement to Musulin and that his statement was consistent with his testimony and the history he provided both CVMH and Children's.

Father stated that he was honorably discharged for medical reasons from the Air Force following a bus accident in Kuwait where he was stationed as a military police officer. Father testified that he suffered a hip injury in the accident and also suffered emotional trauma as a result of the accident. Father testified that he and other persons present were unable to assist injured civilians due to the accident occurring during Ramadan during which time religious

EXHIBIT 1

and legal prohibitions prevented aid from being offered to the civilian victims resulting in several deaths. Father testified that as a result of this experience he was diagnosed with mild PTSD and that he was treating the problem through the Veteran's Administration.

At the conclusion of testimony the Court entered Findings and Fact that, *inter alia*, found Z.P. the victim of abuse concluding that "[m]edical evidence indicted the finding of a subdural hematoma and bi-lateral retinal hemorrhaging were as a result of a shaking injury." Further, the Court found that Father was the perpetrator of the abuse as he was the only person present when it occurred. An Order was entered finding Z.P. dependent as to both parents, leaving him in the care and custody of Mother under the supervision of CYS, and directing that various services, including parenting skills and mental health treatment, be provided, prohibiting Father from unsupervised contact with Z.P., and setting a review hearing in six months.

# DISCUSSION

### I.     Did the Court err in determining that Z.P. was a dependent child when Mother was able to provide care for him?

Appellants' first allegation of error is that the Court erred in determining that Z.P. was a dependent child when Mother was able to provide for his care and welfare. In order to support an adjudication of dependency, the Juvenile Act does not require proof that the parent has committed or condoned abuse, but merely evidence that the child is without proper parental care. *In re*: R.R., 455 Pa. Super. 1, 686 A.2d 1316, 1317–18 (1996).

To adjudicate a child dependent due to lack of parental care, a trial court must determine, by clear and convincing evidence, that the child:

EXHIBIT 1

is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk.

42 Pa.C.S. § 6302. As our Superior Court stated in *In re*: R.W.J., 826 A.2d 10, 14 (Pa. Super. Ct. 2003),

> [W]hen determining whether a parent is providing a minor with proper care and control ... the caretaker's acts **and omissions** should weigh equally. The parental duty extends beyond mere restraint from actively abusing a child; rather, there exists a duty to protect the child from the harm that others may inflict.

Id. (quoting In the Interest of JOV, 454 Pa.Super. 630, 686 A.2d 421, 423 (1996)) (emphasis added). "Clear and convincing" evidence has been defined as testimony that is "so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re*: C.R.S., 696 A.2d 840, 843 (Pa.Super.1997) (citation omitted). See also, *In re*: A.B., 63 A.3d 345, 349 (Pa. Super. 2013). Here the Court concluded that Z.P. was without proper parental care as to Mother due to her failure to ensure that Father's PTSD did not create a risk such that he could not be Z.P.'s primary caregiver.

It is well settled that "[t]he weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." Commonwealth v. Simmons, 541 Pa. 211, 229, 662 A.2d 621, 630 (1995). This principal applies equally where a judge sits as fact finder. Commonwealth v. Davis, 491 Pa. 363, 372, 421 A.2d 179, 183 (1980). When reviewing for sufficiency or weight of the evidence, a court may not substitute its judgment for that of the fact-finder; if the record contains support for the verdict, it may not be disturbed. Commonwealth v. Murdick, 510 Pa.

EXHIBIT 1

305, 308, 507 A.2d 1212, 1213 (1986). A court may not reverse the fact finders determination unless it is "so contrary to evidence as to shock one's sense of justice." Simmons, 541 Pa. at 229, 662 A.2d at 630. Where the court is sitting as fact finder a challenge to the weight of the evidence requires a showing of an abuse of discretion.

In reviewing a decision for abuse of discretion, appellate courts are bound by the facts as found by the trial court unless they are not supported in the record. In re: A.P., 728 A.2d 375, 378 (Pa. Super. 1999) (citation omitted). Further, our Superior Court has consistently held that

> Our scope of review, accordingly, is of the broadest possible nature. It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and witnesses.

In re: E.P., J.P. & A.P., 841 A.2d 128, 131 (Pa. Super. 2003) (quoting In re: R.W.J., 826 A.2d 10, 12 (Pa. Super. 2003)). An abuse of discretion is not merely an error in judgment but exists only when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, or where the court has failed to apply the law or was motivated by partiality, prejudice, bias, or ill will. Harman v. Borah, 562 Pa. 455, 756 A.2d 1116 (2000). See also, Van Dine v. Gyuriska, 552 Pa. 122, 713 A.2d 1104 (1998); Rebert v. Rebert, 757 A.2d 981 (Pa. Super. 2000).

For a decision to be against the weight of the evidence it must be shown that the evidence relied on to reach the decision was so inherently improbable or at variance with the admitted or proven facts, or with ordinary experience, that it resulted in a decision that is shocking to the court's sense of justice. Thomas v. E.B. Jermyn Lodge No. 2, 693 A.2d 974 (Pa. Super. 1997). While an appellate court will review the evidence, determinations

EXHIBIT 1

pertaining to the credibility of witnesses and the weight to assign evidence are matters within exclusive province of the fact finder and may not be disturbed by the appellate court. See, Weir by Gasper v. Estate of Ciao, 551 Pa. 491, 556 A.2d 819 (1989).

Here the evidence supports the finding that Mother was aware of Father's diagnosis that he suffered from PTSD, that he was receiving treatment for that condition, that she failed to ensure that this condition did not impair his ability to care for Z.P. on his own, and that during a period of unsupervised care Z.P. suffered injuries caused by Father. Further, Mother completed a psychological evaluation with doctor Mary Berge which indicated that while Mother had no mental health issues her responses to various questions were evasive and suggested she may be denying or downplaying any mental health issues either of herself or of Father. Viewed as a whole the evidence shows that Mother failed to take adequate steps to ensure that Z.P. would be safe in Father's care due to his mental health diagnosis and thus failed to provide proper care. See, *In re*: R.P., 957 A.2d 1205, 1218 (Pa. Super. 2008)(finding of dependency affirmed as to Mother since even if Mother did not inflict a single bruise, the Battered Baby Syndrome suffered by child would not have occurred but for Mother's omissions as his primary caretaker). Accordingly, there is no merit to this allegation of error.

**II.  Did the Court err in determining that Z.P. was the victim of child abuse?**

Appellants' second allegation of error is that the Court erred in finding that Z.P. was the victim of child abuse as defined in the Child Protective Services Law (CPSL). The CPSL defines child abuse, in part, as

> The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:
>
> (1) Causing bodily injury to a child through any recent act or failure to act.
>
> ...

EXHIBIT 1

(8) Engaging in any of the following recent acts:

…

(iii) Forcefully shaking a child under one year of age

…

23 Pa.C.S. § 6303. Here the Court found that Z.P., who was three-months old, suffered abuse due to bodily injuries cause by his being forcefully shaken by Father.

Within a reasonable degree of medical certainty, doctor Wolford opined that Z.P.'s injuries did not occur as a result of a fall from while in his rocking bassinet or from a disease or other biological cause. N.T. 3/7/16 pp. 10, 14-16. While she acknowledged the possibility that some falls could result in similar injuries, she emphatically explained

> So it's my medical assessment that [Z.P.] showed symptoms: unresponsiveness, not waking up, arching his back, stiffening, the subdural hematomas and the bilateral retinal hemorrhages that this is the result of violent shaking back and forth and that this is the result of abusive trauma to this child, so this is the abusive head trauma and that it is the shaking and the shearing force back and forth that caused this brain injury and these retinal hemorrhages in all four quadrants, both eyes, out to the periphery.

Id. at 14-15. Specifically, she noted that the subdural hematoma and the retinal hemorrhages could not have resulted from a fall from such a short height onto a soft surface. Id. at 14-16. On cross-examination Wolford was asked if the retinal hemorrhages could be caused by meningitis, birth trauma or a short accidental fall and she replied

> I don't – we're talking about different retinal hemorrhages here. His are bilateral in all four quadrants out to the periphery. In my nine years as a pediatrician I have never seen a case report of meningitis nor of accidental short falls of bilateral hemorrhages in all four quadrants out to the periphery. Additionally, from birth remember that those would be resolving on his exam at three months and we know that retinal hemorrhages resolve within weeks.

Id. at 18-19. Finally, Wolford explained that they see children who have suffered short falls onto various surfaces multiple times a week and that she has never observed injuries in any of those cases similar to those suffered by Z.P. Id. at 14-16.

EXHIBIT 1

Doctor Arden testified that based on his training, experience, and readying case studies that injuries similar to Z.P.'s could occur either from abusive trauma or accidental falls. Id. at 38-41, 46-47. Arden referred to an article in the Journal of Forensic Sciences that detailed a case involving a fall down a flight of stairs that resulted in injuries including a subdural hematoma and retinal bleeding in support of his opinion. Id. at 59-61; Resp. Ex. 5. Arden acknowledges that the occurrence of similar injuries in fall cases is rare, id. at 47, and that there was no indication that Z.P. had struck the floor but was instead wedged between the couch and his rocker bassinet. Id. at 49. Finally, while indicating his disagreement that the only possible cause of Z.P.'s injuries was abusive trauma and outlining other possible causes Arden does not offer an expert opinion that the injuries were in fact caused by either accidental trauma or abusive trauma. Id. at 28-61.

Considering Wolford's unequivocal conclusion based on her training and experience treating children who have suffered both accidental and abusive trauma against Arden's testimony that there were multiple possible causes of Z.P.'s injuries the Court found Wolford's testimony more credible and gave it greater weight. Of importance is that Arden acknowledges that such injuries from fall incidents are relatively rare, that Z.P.'s fall was from a low height, and that Z.P. did not strike the floor or any hard surfaces. In contrast the article referenced by Arden involved a lengthy fall down a flight of stairs during which the child could have and likely did strike their head multiple times on various surfaces.

Viewed in its totality Arden's testimony only offered a variety of possible causes for Z.P.'s injuries, one of which is abusive trauma, without offering a definitive opinion as to the actual cause. Such evidence is not sufficient to overcome Wolford's unequivocal testimony, particularly where Arden's testimony supports Wolford by concluding abusive trauma is a

EXHIBIT 1

possible but not the only cause of the injuries to Z.P. Indeed Wolford agrees that there could be other causes but testified as to her methodology in ruling out each of those causes including an accidental short height fall. N.T. 3/7/16 pp. 6-28. The Court's conclusion that Z.P. suffered abusive trauma inflicted by Father is thus adequately supported by clear and convincing evidence. See, In re: R.P., 957 A.2d 1205. Accordingly, there is no merit to this allegation of error.

**III.    Did the Court err in basing its finding of abuse on novel scientific evidence?**

Appellants' third allegation of error is that the Court erred in finding that abuse occurred as that finding is based on novel scientific evidence that fails to meet the Frye test for admissibility. Our Supreme Court has explained Frye is not implicated every time science comes into the courtroom; rather, it applies only to proffered expert testimony involving novel science. Commonwealth v. Dengler, 586 Pa. 54, 69, 890 A.2d 372, 382 (2005). The party seeking to challenge the admission of the evidence must, at the least, establish the evidence is in some way novel after which the burden shifts to the party seeking to introduce the evidence to demonstrate that it is in fact admissible.

Here a review of doctor Wolford's testimony reveals no instance where she relies on novel scientific evidence. Wolford testified that all her answers were to a reasonable degree of medical certainty and throughout her testimony indicates that her answer are based on her training and nine and a half years experience as a board certified pediatric doctor. N.T. 3/7/16 pp. 6-28. Wolford's only reference to articles or published studies was in response to questions by Appellants' counsel, Arthur McQuillan (McQuillan), concerning whether she had ever published or authored any articles or was familiar with the Journal of Forensic Sciences. Id. at 19. Wolford indicated she had published in the Textbook of Pediatric Critical

EXHIBIT 1

Care regarding abusive head trauma and that she was unfamiliar with the Journal of Forensic Sciences. Id.

As noted above, Doctor Arden however did reference and rely on an article in the Journal of Forensic Sciences that detailed a case involving a fall down a flight of stairs that resulted in injuries including a subdural hematoma and retinal bleeding in support of his opinion. Id. at 59-61; Resp. Ex. 5. There was no challenge raised to this testimony and as explained in Part II, *supra*, the Court's decision was not based on that testimony. Accordingly, there is no merit to this allegation of error.

## IV. Did the Court err in failing to recuse itself for bias?

Appellants' fourth allegation of error is that the Court failed to recuse itself due to bias related to this jurists prior role as an assistant district attorney prosecuting shaken baby cases and prior role serving on the CYS Near Death Review Team. Initially the Court observes that no Motion to Recuse was made at anytime during this matter.

Our Supreme Court has explained that

The standards for recusal are well established. It is the burden of the party requesting recusal to produce evidence establishing bias, prejudice or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially. As a general rule, a motion for recusal is initially directed to and decided by the jurist whose impartiality is being challenged. In considering a recusal request, the jurist must first make a conscientious determination of his or her ability to assess the case in an impartial manner, free of personal bias or interest in the outcome. The jurist must then consider whether his or her continued involvement in the case creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary. This is a personal and unreviewable decision that only the jurist can make. Where a jurist rules that he or she can hear and dispose of a case fairly and without prejudice, that decision will not be overruled on appeal but for an abuse of discretion. In reviewing a denial of a disqualification motion, we recognize that our judges are honorable, fair and competent.

EXHIBIT 1

Commonwealth v. Abu-Jamal, 553 Pa. 485, 507, 720 A.2d 79, 89 (1998) (citations omitted). See also, Commonwealth v. O'Shea, 523 Pa. 384, 407-08, 567 A.2d 1023, 1034 (1989); Commonwealth v. Bonds, 890 A.2d 414 (Pa. Super. 2005). The rule is simply that "disqualification of a judge is mandated whenever 'a significant minority of the lay community could reasonably question the court's impartiality.' " Commonwealth v. Bryant, 328 Pa. Super. 1, 476 A.2d 422, 425 (1984) (citations omitted).

As noted above this matter was not raised by way of a motion and in any case such a motion would have properly been denied as Appellants' allegations fail to raise to the level that would cause a significant minority of the lay community to reasonably question the court's impartiality and as such recusal was not warranted. See also, Abu-Jamal, 553 Pa. at 508, 720 A.2d at 89-90; Commonwealth v. Stevenson, 829 A.2d 701 (Pa. Super. 2003). Appellants' position is that once a judge has served as a prosecutor in a case involving a shaken baby they cannot be impartial in any case with a similar fact pattern. This position is not supported by the evidence in this matter and would serve as the start of a quick slide down a very slippery slope if endorsed by the courts.

Taken to its logical conclusion Appellants' argument would mean that any judge who previously practiced criminal law as a prosecutor or defense attorney would be precluded from presiding over any criminal matter since their prior position rendered them automatically biased. Similarly no judge who had represented civil clients could oversee a civil proceeding, those who practiced in the area of domestic relations would be barred from presiding over those cases, etc. The result is patently absurd and the Court had found no case that reached such a holding. Instead, as noted above, in each case the party seeking recusal must "produce evidence establishing bias, prejudice or unfairness which raises a substantial doubt as to the

EXHIBIT 1

jurist's ability to preside impartially." <u>Abu-Jamal</u>, 553 Pa. at 507, 720 A.2d at 89. Here there was no evidence offered that established any degree of bias and thus there is no merit to this allegation of error.

## V. Was trial counsel ineffective?

Appellants' final allegation of error is that McQuillan was ineffective as trial counsel for failing to object to the novel scientific evidence that was the basis for the abuse finding and for failing to file a motion to recuse. It is clear that in a dependency proceeding parents are entitled to counsel. The Juvenile Act explicitly states that "a party is entitled to representation by legal counsel at all stages of any proceeding under this chapter and if he is without financial resources or otherwise unable to employ counsel to have the court provide counsel for him." 42 Pa. C.S. § 6337. Our Superior Court has determined that parents whose children are the subjects of dependency proceedings have the right not only to counsel but to effective representation by counsel. <u>In the Matter of J.P.</u>, 393 Pa. Super. 1, 573 A.2d 1057 (1990) (*en banc*). <u>See also, <u>In re</u>: K.D.</u>, 871 A.2d 823, 828 (Pa. Super. 2005); <u>In re</u>: S.M., 418 Pa. Super. 359, 366, 614 A.2d 312, 315 (1992).

In <u>J.P.</u> the Superior Court conclude that a parent could raise an ineffective assistance of counsel claim in a dependency proceeding on direct appeal but was unable to establish a precedential standard for defining effective counsel. <u>J.P.</u>, 393 Pa. Super. 1, 573 A.2d 1057. Later in <u>S.M.</u> the Superior Court established that in the context of a dependency proceeding in order for counsel to be deemed ineffective a parent must make a strong showing of ineffectiveness of counsel. <u>S.M.</u>, 418 Pa. Super. 359, 367-68 614 A.2d 312, 315-16. The <u>S.M.</u> Court explained that under this heightened test for ineffectiveness a parent must come forward with evidence that indicates to high degree of likelihood that, but for unprofessional error on

EXHIBIT 1

part of counsel, the child would not have been found to be dependent. Id. See also, K.D., 871 A.2d 823, 828. The Court in K.D. concluded that this higher standard requires that the appellant must show by clear and convincing evidence that it is more likely than not that the result would have been different, absent the alleged ineffectiveness. Id. at 829.

For the reasons discussed in Part III, *supra*, there is no merit to Appellants' claim that McQuillan was ineffective for not objecting to the novel scientific evidence that was the basis for the Court's conclusion that Z.P. was the victim of child abuse. As discussed above there was no novel scientific evidence introduced or relied on by the Court in reaching its conclusion and so McQuillan could not be ineffective for failing to challenge that which did not happen. To the extent that the article relied on by Arden constitutes novel scientific evidence, McQuillan cannot be ineffective for not seeking to exclude evidence being offered on behalf of his clients.

As to the claim that McQuillan was ineffective for not seeking recusal on the basis of bias or prejudice there is no merit to this allegation since as discussed in Part IV, *supra*, there is no evidence of bias to support such a motion. Even if this jurist's prior work as a prosecutor and member of the CYS Near Death Review Team could establish bias, Appellants' allegation of ineffectiveness still must fail.

In order to conclude that McQuillan was ineffective for failing to raise the issue of recusal, the Appellants must show by clear and convincing evidence that it is more likely than not that the result would have been different, absent the alleged ineffectiveness. K.D., 871 A.2d 823, 828; S.M., 418 Pa. Super. 359, 367-68 614 A.2d 312, 315-16. As discussed in Part II, *supra*, the evidence that Z.P. suffered from abuse is clear and there is no evidence that a

EXHIBIT 1

different judge reviewing the same evidence would reach a different conclusion. Accordingly, there is no merit to this allegation of error.

As there is no merit to any allegation of error and for the reasons discussed herein, the appeal should be dismissed and the Court's Order of March 9, 2016, affirmed.

RESPECTFULLY SUBMITTED,

Tamara R. Bernstein, Judge

May 6, 2016

EXHIBIT 1